The District Court erred in holding that pickering-balancing favors plaintiffs as a matter of law. My wife put me on it once, and I, after three or four days of finding out what all my relatives said about gluten, I gave up on it, you know? So I really don't know. So all I'm left with is seeing the exchange. And it's very hard for me to understand why. I know it's on Facebook, okay. But in fact, the exchange was just between Ms. Lloyd and Mr. Davey. Davey? That's all it was. I don't see why the exchange between them was, in this case, okay, Facebook, but in this case it's just the two of them. How is that different from if they exchanged e-mails? How is it different? There's a case on this. How is it different from if they were shouting at each other in a bar saying these things? That's all he did is he was talking to her. She's the one. She's the one. She's the one. Went shouting all over as loud as she could. Oh, look what this guy is saying. But I don't see how it isn't the kind of the narrowest. If it's the marketplace of ideas, it's a very small market when you're talking to one person and saying. I don't get how it becomes, how we got from a little nudging to where we are here in World War III. I don't get it. Sure, Your Honor. So I think there is two differences between posting on Facebook and having a private conversation with a friend. The first is that if you look to A55 of the record, plaintiff himself actually attests that he posted these comments on a friend's Facebook page, which anyone with access to his friend's page could view. So that's very different from a private conversation at a bar. Fair enough, fair enough. But there is no evidence that anybody else ever went there and got this. The evidence is that in fact the conversation stayed between the two of them until she made it public. Respectfully, Your Honor, I would disagree. For example, if you look to the post itself at A66, you'll see that it says you, the complainant, and two others like this. So at least these three people were able to see the speech. But I think the important part is the possibility that others with access to his friend's page could view the speech, which was written down, could screenshot it, and could disseminate it as the complainant did here. So I think in that sense it's also very different. Tell me, who could, again, my ignorance, who could get on, go to Facebook and get it directly from Facebook? Friends, people, I don't know how it works. So I think as plaintiff himself attested, anyone with access to his friend's page, for example, his friend's Facebook friends, could have access to that page, could see those comments, and could further- Well, a limited number of people, an infinite number of people, it depends on the person and whether that person, who that person allows on the page. That's correct, Your Honor. That's not clear from the record. But I will point out that in this case, complainant confirmed that she had sent the comments in her complaint to the Legal Aid Society. And I think that's also very key to this case, because the agency's assessment of disruption was based on its fear of further publicization. And it was certainly reasonable for the agency to believe that upon confirming the complainant had sent these statements to legal aid, that legal aid in the future, if plaintiff were restored to the bench, might lose public trust in the agency, might file recusal requests against the agency. I want to assure you, and I think I can do this, that the presider will give you enough time to make up for my ignorance. Thank you, Your Honor. I object to the premise of that. I think in this case, it's also very important to look at the manner of plaintiff's speech and its direct nexus to his duties. If you actually look to the manner in which plaintiff expressed himself, in which he used words like underclass or laziness or failure, it certainly gives rise to at least a suspicion that he might have preconceived notions about those appearing before him. Maybe one way to look at this, but you educate me, is that if he had, in this very limited Facebook space, referred to specific matters in front of him, and that got out, it wouldn't matter that it was in a very specific context. You'd have a more powerful argument, and maybe it's a factor that this is a more generalized, potentially regarded as a more generalized set of statements about policies, but it would necessarily be true that there would be a heightened concern about the appearance of bias, and in fact, maybe bias in connection with particular litigants, right? I would certainly agree with that, Your Honor. But even without him calling out a specific litigant or a specific issue, he was still commenting on benefits that he himself reviewed, and importantly, one of the jobs of an ALJ is to make credibility determinations about those who appear before him, and I think it's very concerning that someone who expressed- I think it's certainly a factor. Again, I push back on the fact that this was such a limited platform. In fact, I think there's evidence that other individuals with whom the plaintiff was not acquainted could see these comments, but even assuming that it is this limited world, I think that's only one factor, and courts have actually looked to also the manner of the speech, importantly the nexus between the speech and the plaintiff's duties. I think it's also important in this case to highlight that plaintiff is a hearing officer who is the public face of the agency to its clients, and that makes this case very different from some of the cases that plaintiff has cited where it was a low-ranking official whose speech could not possibly be imputed to the agency. Here we have- All right, so one of the questions or one of the things that I saw is the district court seemed to be very focused on actual bias, and I think your argument is the agency has a very strong interest in guarding against the appearance of bias. Is that fair? That's absolutely correct, Your Honor. And so then what we need to do then is weigh the agency's interest in avoiding an appearance of bias versus the free speech rights that person has. And so what is it that you can give us that suggests we need to weigh it in favor of the agency, even to the point of where you ask for summary judgment? It's one thing, I think, to say that they didn't prove summary judgment, that they deserve it. But what do you get summary judgment on? So, Your Honor, I think in this case, this court has repeatedly held that an agency's concern for its reputation, for preserving the public trust, is sufficient to justify even the termination of a public employee. And here we have statements that-  So, if I may, Your Honors, here we have a case where even a neutral third-party arbitrator later held that plaintiff's continued employment as a hearing officer would be untenable in light of the fact that his statements could at least raise a suspicion of bias, could at least raise a suspicion- I'm afraid his statements got out because of all the litigation that followed, and all the fault that all had followed, not because these two people had the conversation. I'm wondering, what are the ways it's phrased in terms of when can you take an employee's- when can you respond to an employee's First Amendment-protected speech? Is it likely disruption? And it seems to me, and if they went and they found that that's in fact what happened, that people were saying, legal aid was saying, I don't want him there anymore, I don't trust you. In fact, I didn't see very much in anything that suggested that there was in fact likely disruption. In fact, they kept going back to it and they liked it. The speech didn't seem to matter in terms of- it did not seem- there seemed to be no evidence that the speech in fact caused likely disruption rather than, gosh, if people knew about this, they would think that we were biased. So I think that here, the absence of recusal requests or perhaps action, direct action by legal aid, can be explained perhaps by two factors. One is that the plaintiff was immediately taken off the bench as soon as the agency received the complaint. So there's simply not a chance for an applicant, for example, who appeared before him to request recusal on the record, and that's what's required. And the second is I don't think that legal aid's silence to date necessarily means that they condone the speech or do not- Of course they don't condone that speech. The question is whether, to me, I didn't make up the word, is likely disruption. I can see where they would say, my heavens, if this gets out, this can happen, that can happen, the other thing can happen, but it didn't happen. I think in this case, Your Honor, because plaintiff was so quickly removed from the bench, the absence of direct action by legal aid doesn't mean that the organization would not take action if he were restored to the bench, and it certainly doesn't mean that they wouldn't lose faith- Is there any evidence that anybody asked legal aid what the reaction was? So in this case, the director of hearings did inquire of a personal acquaintance, but no one asked the top brass at legal aid what they might do if plaintiff were restored to the bench, and I don't think it's not the agency's burden to necessarily go forth and make that inquiry, especially when they were trying to avoid the precise negative publicity and reputational harm. Well, and there's two kinds of disruption, right? There's the disruption on the recusal, and then there's disruption on the general loss of public confidence or loss of public appearance, and I don't think our cases require you to prove that either of those have happened, right? Like, is that right? That's correct, Your Honor. This court has repeatedly held that actual disruption or actual reputational harm need not occur, and I just mentioned that loss of public trust is something that's inherently very difficult to measure, so I think that in this case, the absence of recusal request is not a dispositive proxy for that kind of harm, and I understand I'm over my time, but if I may just very quickly- Yeah, and I really need to talk to you about the pretext argument, so if the presider will allow when you're done. Yeah, go ahead and finish your point, and then let me do it. I think at the very least in this case, Your Honor, even if the court doesn't think the balance weighs in favor of the agency as a matter of law, at the very least, reversal of the reinstatement is warranted because the agency has done enough to create a triable issue of fact that its assessment was reasonable. This court has held that when reasonable minds can differ as to whether the agency's assessment was reasonable, that summary judgment is improper, and here, it's our position that at the very least, there are reasonable differences of mind as to how public the speech was, as to its potential for disruption, as to what silence from legal aid or the lack of recusal request can mean, and to the extent the court- So you're saying that our assessment of the reasonableness of the agency's concerns about appearance of bias, for example, is a factual assessment? So, Your Honor, the Pickering balancing itself is- Would you answer, is that a yes? Is that a factual assessment, or is that a legal assessment? There certainly can be factual assessments that bear on the reasonableness, so I think the reasonableness inquiry and the balancing itself is a question of law, but certainly there can be facets of it that are questions of fact. For example, the manner of the speech, the proper characterization, the context, etc. And here, while we think that the agency has satisfied its burden as a matter of law to show that its assessment was reasonable, to the extent the court finds there to be these outstanding issues of fact, it must reverse because plaintiff was not entitled to summary judgment on its claim. What are the outstanding issues of fact? So, for example, we think that there, at the very least, is an outstanding issue of fact about whether the speech was public-facing. For example, we pointed to the fact that plaintiff himself attested that he posted on a friend's page, which could be accessed by anyone with access to his friend's page. We think that we've shown at least that there's an issue of fact that the speech could be further publicized by pointing to the fact that the complainant had confirmed she sent the comments to legal aid. This is at A700. And we think that, at the very least, we have established that the speech could discredit the agency, and we've pointed to in our briefing the testimony of multiple high-level OTDA officials and also the findings of an arbitrator that any objective reading of the speech could give rise to suspicion of bias. The possible discrediting of the agency. There's not testimony or evidence contradicting that. That's correct, Your Honor. But the question is also whether there was evidence that it was actually discredited, not possibly, and could have been discredited. Yes, Your Honor. But, again, the agency does not have to point to actual discreditation or actual harm. The standard here is likely- Likely disruption. Likely disruption. So they had a proper concern, based on what they had, that sometime in the future it would be disruptive and therefore was likely disruptive. That's correct. And this Court has held, for example, in the Piscitano case, that an agency's officials' assessments and judgments about these types of reputational harm are sufficient to inform its reasonable assessment. So the question that I have is that if your stronger argument is reputational harm as opposed to actual recusals, then what do we do about the fact that he was put in a role where he decides and signs appeals that other hearing officers did, right? Like, that seems to me to also present the kind of appearance problem, which also raises the potential that maybe there's some pretext here as opposed to- So make me comfortable on this. What am I supposed to do about the fact that that's not a great fact for you guys? So, Your Honor, I first mentioned that when he was placed in a senior attorney role, he no longer decided benefits appeals. Instead, he was designated to review recusal requests that applicants had filed on the record against other judges. So I don't think it's the case that the agency put him in a position to directly decide what levels of benefits applicants should be entitled to. It was only recusals that he was signing and doing. And there's no evidence that the role he did play, there was interference with the role he did play by this exchange of messages. I mean, it did not appear, there is no evidence, that the statements he made interfered with the role he was given afterwards, as doing something on less public faces. That's correct, Your Honor. And here, because the agency's primary concern was for its reputation, taking plaintiff off the bench where he could interact with as many as 30 applicants a day, and instead having him sit in a room where he does not have face-to-face, direct interactions with benefit applicants, certainly undercuts at least the appearance of partiality concerns, and the appearance that the agency is standing behind someone who has perhaps expressed statements that demean the agency's client population. So both of these reputational concerns are mitigated in this case. So the amicus brief points out the Republican Party v. White decision as a reason why it's clear that what the agency did here was improper. What's your response to that? So I think we have two responses. The first is that that's not a Pickering case, and it dealt with judicial candidates. Here we have an administrative law judge who's employed by the state to conduct these fair hearings. And second, I think our response is that the agency is not saying that its administrative law judges can't have any policy opinions. The issue here is that plaintiff was speaking about a benefit that he himself has hearings to review, and moreover, the manner of his speech expressed at least could give rise to the appearance that he might have partiality and bias against the people that he was entrusted to be objective about. So he was removed for his speech, not because of the possible consequences of his speech. What was he removed for? He was removed because of the agency's predictions about disruption from his speech. So I think it's not the case that the agency was retaliating against his viewpoint or took issue with his particular view. It was that the agency was concerned his speech, and especially the manner in which he expressed it, and the fact that he was sitting in a public-facing role could undermine its appearance of impartiality and could affect the agency's relationship with the community. And just to follow up on, I think, the concern that Judge Sack has, it's – I'm just saying you would judge. Judge Sack has – the – Judge Corman says that the plaintiff awarded public benefits to applicants in approximately 95 percent of his cases. And so one could draw the conclusion, and the district court here did draw the conclusion that if that's the case, then what's the problem? There's no – he's not actually biased. So I think that, again, Your Honor, the primary concern is for the appearance of impartiality and the loss of public trust in having someone who was expressing statements that showed disrespect towards the agency's client population. Is it correct that it was 95 percent of the cases? So, Your Honor, the agency would disagree with that figure, or the agency does not keep track of that figure. In fact, it's precluded from doing so by its own regulations. So where does that number come from? So I think the number came from something that plaintiff himself proffered at the arbitration hearing. But even if you were to accept this figure as a relevant fact, it doesn't undercut the agency's concern for its appearance of impartiality here. If there are no further questions, we would urge the court to reverse the reinstatement. Thank you. Good morning, Your Honors. May it please the court. The balancing test requires that this court, the district court as well, weigh the value of the speech against the government's interest in potential or actual disruption of its services. In the ordinary case, the government's burden is to show a substantial showing of likely disruption. But that's the ordinary case. This court has also said when the value of the speech is in the heart of the First Amendment, the heart of the public concern test, the burden on the government increases. In this case, this speech, well, this speech is why the First Amendment was enacted in the first place. This is speech about government policy that was basically said in the course of what, for today, is our public square. It was between two people. It was not a marketplace of ideas. I've heard that 10,000 times. This was the world's smallest marketplace. It was two people, one talking to the other. I know what they were talking about. I know it was important public matter. But the notion that there's no difference between his having this conversation about this, this exact conversation with a person, not a friend, obviously, but a former classmate, is of a different sort than if he went out and literally became an officer of the let's stop the bloodsuckers. It's really public. And I think there's a big, the mere fact that it's about a matter of legitimate public concern, sure, that's important. Part of that debate, sure. But it's such a small part of the debate, and I think that matters, doesn't it? It does matter. The public concern test doesn't, in Rankin versus McPherson, it was a comment from an employee to her boyfriend that happened to be overheard by somebody. And the Supreme Court nonetheless held that that was in the heart of speech that was of public concern, was of greatest interest. Remind me, I'm serious. Who won Rankin? Was the speech punishable or not? Say it again, Your Honor. Was the speech in Rankin punishable or not? It was not. It was not. The speech was protected by the First Amendment. It was certainly part of the inquiry. This is not the instance in which a bus driver was speaking on the issue of welfare policy. And this is certainly not the issue of when a hearing officer on welfare, on benefit administrations, is speaking on crime, right? Here we have someone who is responsible for dealing with benefits, a public-facing person who's dealing with benefits, speaking on the exact thing that they are doing. And I'm wondering, at what point does it become a question of impartiality or any of the other stuff that, like, we judges would need to be worried about? Why is it different in terms of, like, the public-facing concern for your client? Well, I'm going to push back just a little, Your Honor, because I think— You can push back all you want. That's why we're here. We're trying to figure it out. The court below found, and it wasn't really disputed, that what hearing officers like my client do was basically make— you know, the questions are, did they keep their appointments? Did they properly state their income? They don't deal with big questions about how much the government should or should not be subsidizing people who are down on their luck or people who need some help. That was what his conversation on the Facebook page was, but it's not really what he did for a living. And so, again, what he was talking about, it was like Pickering, where the teacher was talking about something kind of related to what he does, the difference between academic and athletic spending, but it wasn't really at the heart of what the teacher himself was doing, what Mr. Pickering himself did. So, given that this is really at the heart of the First Amendment and that the defendant's burden is quite high as a consequence, what is there evidence of— Could we, as just a working principle, say that likely disruption is the test? Was there likely disruption or not? I think not, Your Honor, because— If you're right, isn't that enough? I mean, what else do we have to do? If there was no proper finding of likely disruption, why isn't that the end? Why don't you win? Why isn't that enough? Well, I do, actually. I think the burden is higher because of the nature of the speech in question, but if they can't even meet that burden, which is the burden in the ordinary case, then yes, we win. That's right. What would likely disruption look like, though? I mean, how is somebody supposed to know when a future applicant is going to feel like they didn't get a fair shake or that they didn't get a fair hearing? Well, I mean, there's lots of instances where they feel they don't get a fair hearing, but, Your Honor, the question is, is there going to be disruption to the agency's services, right? So in this case— No, that I don't think is the question. The question in the Pickering balancing is—and I ask this of your friend on the other side— is how do we measure the reasonableness of the government's interest in assessment of likely disruption? I'm sorry, how— I'm not in the business of figuring out likely disruption de novo in an agency like OTDA. So the question to me—but maybe this is the wrong question— is how do we measure the reasonableness of the government's or the agency's assessment of likely disruption? Is that the wrong question, or is that the right question? I think it's a good question. Ah, a good question is not right or wrong. So is that the right question, in your view, or is that the wrong question? I think it's a—I think it's—I would modify it slightly. I think whether the government made a reasonable determination after a reasonable investigation which demonstrated some level above, in our view, the substantial showing of likely disruption, whether that conclusion—whether there was evidence to support that conclusion. And when you frame it that way, where have we framed it in that way? Because I've not heard that framed. Well, I mean, in Jeffries, the court certainly described the substantial showing of likely disruption. And in other cases, for example, Howell v. Huntall, the court— Those were all in the context of trying to figure out—trying to measure the agency's or the government's assessment. Right. So, Your Honor— I think it's actually a pretty important question because if the question is as you pose it, then maybe we go in a particular direction. If the question is as I pose it, then maybe we go in a very different direction. So tell me, what have we said that supports your framing? Well, let's—I won't even go with what you said. Let's go with what the Supreme Court has said. That? That's a showstopper. And you can look at Pickering itself for the conclusion that this court, and the district court, is not supposed to be a rubber stamp. So what did the board find in Pickering? That Mr. Pickering's letter damaged reputations. It was disruptive of faculty discipline. It was—it fomented controversy. It fomented conflict and dissension. And the Supreme Court looked at all of those findings, and it went through them, and it concluded that the board didn't really have any evidence to support it, even though it also concluded that some of the things in Mr. Pickering's letters were, in fact, not true. So it's not a rubber stamp, your conclusion as to whether or not the government's assessment is or is not reasonable. So then you're then telling us that we need to look at the particular record in the particular case. And here, what is the evidence that contradicts the government's evidence, and I asked your friend about this, that there will be—there is likely disruption? Because I don't—I didn't see on the other side any specific facts that disruption was not likely, other than by reference to what it—you know, the fact that there are no recusal requests, but as your friend from the government said, that may be the result of speedy decision-making that is deciding to move—to remove your client from his position. Well, the fact that the initial complaint was from someone who apparently had an undisclosed grudge against our client and lied about it in her letter, that's of some significance. A second point is there were no requests for reconsideration. So maybe they removed him, and that limited the possibilities of recusal, but they couldn't change the past. And anyone who saw this, legally, if they thought it was really horrible, would have made a motion for reconsideration of some determination made by a commissioner's designee who wrote a decision that was based upon my client's recommendation as a hearing officer. Third, they continued to use his ID number on notices of hearing. What does that mean? Well, they send out notices of hearing saying, you're going to have an appellate here, you're going to have a fair hearing here at OTGA, and it's on such-and-such date. And there was—there's an AOJ number. So people were anticipating that he was going to continue to sit where he was. I'm sorry, Your Honor, I didn't— People were anticipating that he was going to sit at future cases, even though, in fact, he may or may not. Is that what you're saying? Well, but they continued to use his AOJ number. And therefore, people anticipated that he was going to continue. Yes, exactly so. And there is evidence that people will make objections before the event. No one did. And that, too, is an important— And we don't have anything anywhere as to why legally I decided not to do anything. Yes, Your Honor. I mean, that's right. We have nothing. We don't know. Nobody ever asked, hello, Mr. Legal Aid. There were no objections other than the initial anonymous— We're deducing what Legal Aid thought or not. We have no evidence as to why it didn't do what it didn't do. I'm sorry, Your Honor, I still did not hear you. Not hear me and not understand me are two— No, no, I didn't—literally did not hear you. I'm saying that we are left to wonder why Legal Aid decided not to bring this up in any of its ever, as far as we know. Ever. Past cases, present cases, future cases. And Mr. Spitzberg asked a friend of his at Legal Aid whether or not there was any scuttlebutt about hearing officers. And the friend said, no, there isn't. I've got a question about facts, though. So, like, you've got the 95 percent that is disputed, and we've also got the submission of the— or you're saying the lack of evidence that anybody has asked for recusals in advance, but I think your colleague said in the brief that people don't make recusals in advance. That's not part of the way the process works. Is that at least a question of fact? Well, Your Honor, there was a statement of undisputed fact in our statement that I guess Judge Corman relied upon because defendants objected to it as immaterial as they objected to virtually everything in our statement of undisputed facts as immaterial. The statement said, on some occasions, sometimes people will raise this prior to the hearing. And there was evidence. We cited evidence that supported it. And, again, they didn't respond at all. And so I think it's appropriate for Judge Corman to have concluded, as he did, that that was an undisputed fact. I'm sorry. So you're saying that it was a conceded fact. It's not a disputed fact. Is that what you're saying? Fair enough. Conceded. I mean, it matters because we're trying to figure out whether or not summary judgment can be entered here. I'll go with conceded. That's fine. I mean, they're supposed to respond with evidence if they dispute it. And if they don't, then it's conceded. And let me just do the last part to answer your question, Your Honor. It's really questionable about whether defendants even believed this stuff about disruption for the point that Judge Perez mentioned earlier. After the suspension, they based- Remind me of that point. I was about to. Yes, Your Honor, I was just about to. After the suspension, they essentially put him on the court of appeals. He reviews recusal decisions- And that's a bad thing to be put on the court of appeals, is that right? I'm sorry? Your position is that it's a bad thing to be put on the court of appeals. Yeah. Yeah. So his name goes on those decisions, right? It goes in the record. So if he's kryptonite, if they have to hide him somewhere, this is just inexplicable. Now, defendant's answer to this is, well, he's not in the same room at the same time as the appellants. But if he's really kryptonite- At that point, and just suss this out for me, I don't know, what were their options? So they could have suspended him- Appeals, that's for sure. What were their options? His main job after the suspension was to do litigation support work. Right. So if the agency is in litigation, someone represents it, and he does research and writing and things of that sort. And that would have been regarded by him as a demotion of some sort? Well, I think it was- Because this was- Put him at the bottom of the seniority scale. So the kind of work was- I don't think he would have viewed it as punishment if it weren't for the fact that it was in response to this apparent conclusion that he had done something wrong. Your Honor, I'm way over my time. I'm sorry. Well, I've got some more questions. Okay. This is a difficult case for me. Was this during just the investigative stage, or was he on this court thereafter? How long was he on that court of appeals, quote, unquote? Your Honor, I don't know if he still is, but at the time that we wrote our summary judgment papers, he still was. And that began in July of 2016. Okay. So- It's a strange way for the government to have brutality against them, isn't it? You know, maybe this has no legal bearing at all on anything. But it seems to me that what they were trying to do rightly or wrongly was- I'm sorry, what they were trying to do rightly or wrongly was- Maybe wrongly, was to defend their agency. You know, it's not- Well, I'm sure- To leap from that to the notion that they did all this because they disagreed with what, in fact, he said. I don't know how to make that leap. Well, Your Honor, again, why did they put him on the court of appeals if they were trying to defend their agency? Well, he did reject other options, right? Like, didn't they try to put him in other places, and this was where they settled? Because they did want to maintain his salary and the like. Is that right? Well, again, his main job after the suspension was litigation support. They didn't have to add to it. So, you know, there's no obligation to do that. And there's all sorts- I mean, we've put them, you know, the variety of different things that we think are suspicious in our brief. And I won't repeat all of them, but, you know, they kept him without pay, even though they were obligated to put him with pay after a certain period of time. The change in civil service title was unnecessary and put him in a- That's why you're here. But the- Yes. Let me just ask you a couple questions. Do you agree or disagree that the appearance of impartiality is an important government interest in this case? Well, the appearance of impartiality is important, but it's not affected by someone commenting on general government policies.  What if it were the head of the agency who made a series of comments about government policy that were contrary to the agency's own expressed views or positions? Well, the head of the agency, Your Honor, probably doesn't have quite the same First Amendment rights as my client does because- All right. What if it were a high-level, not the head, but a high-level member, a very high-level member of the agency, but not the head? Your Honor, this is why it's a balancing test because we'd want to know exactly what that level was and whether they're responsible actually for making government policy, and was that inconsistent with the agency's policy. And if I can, Justice, Your Honor, this brings up a really, really good point because what my client was saying on Facebook was completely consistent with the agency's policy. The agency's policy is to use employment whenever possible to get people back on their feet. This is on page- If it's consistent, how are they retaliating against them? Retaliating against them for saying what they thought? Well, I don't know, Your Honor. I mean, that's a good question. But if you look on page 98 of the record- Is it consistent? Mr. Rossman, be careful. Is it consistent with the agency policy to say if you're going to be that nasty then, FU2, your morals suck because they create an underclass dependent on government handouts that translates into generational poverty? Well, I- That is not consistent, I hope, with the agency policy. Well, the use of the curse probably would not be- And a lot of the rest of that. Well, I mean, I'm not sure I agree, Your Honor. The point is that you should try to use employment. The morals that he's referring to is what was said previously by Ms. Lloyd in the previous comment, right? And her argument was, well, you're wrong that we should require people who are receiving these kinds of policies to try to get work. And that is the agency's policy. That is, you know, using employment as the primary means to get people- So, Your Honor, let me help you. Sure. Your argument is that we don't have to conclude that it's consistent with the agency policy to rule in your favor. Of course, that's true. And thank you very much for the help. I do appreciate it. But I can't imagine that's consistent with the agency's policy, whether as a matter of tone or as a matter of substance. As a matter of tone, I suspect it wouldn't be what the agency would prefer. But as a matter of substance, it was pretty close. And that, indeed, is what one of Mr. Dobby's bosses said. What are we to make of the fact that Judge Corman seemed a wonderful judge, but he seemed to be exclusively focused on actual reputational or operational damage, as opposed to likely, or the government's assessment of likely, reputational or operational injury? I think Judge Corman did assess. He looked at both. And where do I find that in the appendix, in his opinion? In his opinion? Yeah. Find me the language where he looked at the second part of that. Well, Your Honor, I'll do my best. But when he spoke about the director's inquiry to Legal Aid, that certainly was about it. But when he spoke about the absence of recusals, that was certainly... That is actual. That is a focus on actual injury or actual problems, as opposed to the government's, remember the way that I framed it, as opposed to the government's assessment of likely reputational or operational injury. So where did he talk about the second? And I think, maybe I'm wrong, the government's right that we have focused in our own precedent, in our own jurisprudence on this issue, on the government's assessment of likely injury. Obviously, if there's actual injury, that's pretty compelling evidence. But likely, the reputational injury is the thing that we seem to be very focused on, contrary to what I think Judge Corman was focused on. Okay. So the question is, what's going to happen in the future? We don't know what's going to happen in the future, but if... That's exactly right. So I don't know, and why don't I defer, to some extent, to the government's assessment? Well, in this case, eight weeks go by, and there's no objection by anyone about anything related to Mr. Davi's Facebook. Now, that certainly is an important piece of evidence about what's going to happen in the future. I mean, the only thing... Are you saying it's an important piece of evidence that there was no likely disruption? Yes. It's crucial. There's never been, to this day, there's never been a request for reconsideration of anything Mr. Davi did prior to his being taken off as a hearing officer. You know, I think it's helpful to go back to at least the words I've said a lot, and it's likely disruption. Did they find likely disruption or not? If it was likely disruption and it was found in good faith, then they could do what they did. If it wasn't likely disruption or it wasn't found in good faith, then they couldn't do what they did because he had First Amendment rights. That's absolutely correct, and the point I wish to make is that, again, if you want to determine whether or not this is just a rubber stamp to the agency, you just look back at the Pickering case, which the Supreme Court did not just rubber stamp what the Board of Education did there, and the standard is at least a substantial showing of likely disruption. So it can't just be... The employee would just never win. But let's say that Judge Corman, just hypothetically, let's say that Judge Corman did not engage in that analysis on summary judgment or with respect to the, I guess, the injunction, which your friend has asked us to undo so they can proceed. What do we do? Well, I obviously don't agree with the premise of your question, Your Honor, but obviously you would have to... You might have to send it back to ask him to do that if you're that conclusion. But, again, I think there's lots of stuff in his opinion that relate to... Likeliness is going to depend on what actually happens. Did someone complain? In usually cases where they find likely disruption, let's take two opinions of this court, Licurdo and Pappas. There was, you know, there was a lot of media in both cases. It was big news stories, and the courts properly concluded in those instances, well, this is going to create a real public problem if we don't do something about it. There was nothing like that here. So... I think the irony is perhaps all of this litigation about these periods are going to create the likely disruption rather than... Although there still doesn't seem to be much in the way of... They're not covering us very well, are they? Well, maybe they'll cover this argument. But you are saying, I think you're acknowledging that if there had been that evidence of actual disruption, where the Legal Aid Society had asked for his recusal on a few occasions, that would have sufficed to permit the government to remove him. Is that right? You know, it would depend, I think, on how many and what basis was... But if there were enough? If there were enough, sure. Although, again, you've got to weigh it against the employee's First Amendment rights. We're not talking about in this case. Let's say that Legal Aid Society actually piped up and said, you know, we want to... He should be recused in all cases. Would that be enough, given what he said? No, I don't think so. I mean, suppose they... Why not? Well, because it would depend upon whether there was a good faith basis for making that assertion. If Legal Aid said, you know, this guy was out at a... You know, he voted for the Libertarian Party last month. We think he should be recused in all cases, and we're going to make recusal requests. I think in those circumstances, the agency should... would not have a substantial summing of likely disruption, because there's... That may be a different part of the test. It still would be likely disruption. That may not be enough under those circumstances, but if they say, my God, we don't like his voting for the Libertarians, and therefore we're going to ask him to recuse for the rest of his life, that's a likely disruption. Well, it is a likely disruption, but you would have to question how credible it would be for Legal Aid to say, we're going to do this, even though we're going to lose every time, that they would continue to do it for... No, no, no, no. Look, it's hypothetical, but it's the Legal Aid Society, which is particularly hypothetical, saying he has evinced by referring to a preference for a particular party that he is going to be biased against certain parties that come before him. And so we will ask for his recusal in every case. And other, you know, institutional actors ask for the recusal, his recusal in every case. Why isn't that sufficiently disruptive, that the agency can't use the fact of the speech, the reference for the preference, express preference for one party over another, to remove him? You know, Your Honor, I've got to believe that in that particular context, the hypothetical we're just discussing, that the employee's First Amendment right to support a political party ought to outweigh whatever disruption Legal Aid thinks they can impose upon the agency. That's how I would view it. Very helpful answer, actually. Okay. If I can just... I was very surprised to hear you cite PAPAS as something that supports... You, in part because PAPAS, for evidentiary matters, didn't require a survey saying that kind of language would make me feel nervous about police officers. It didn't look at civilian complaints. It took the finding of a neutral third party whose job it was to assess whether or not this was going to hurt the functioning of the agency. And concluded that that was enough to make the speech actionable. In this case, we had a neutral arbitrator decide, nope, there wasn't any proof of actual bias, but there was enough there to decide that this was actually going to hurt the public trust in the appearance. So why does PAPAS help you? PAPAS helps us in this regard. First of all, of course, the court concluded that it would be a much different case if PAPAS had not affirmatively tried to publicize his views. Second, PAPAS' speech itself was not what we would call in the heart of the First Amendment. And third, and this is why I raised it... It's not an evidentiary issue. It has to do more with the weighing of the import issue. That's part of what PAPAS... It's a different prong. You're saying PAPAS helps you for a different part of the Pickering test. It's not the actual distribution part. No. I was going to get to my third. The third part is that in PAPAS there was news stories all over the place. And this was, you know, another controversy that was public and that would have affected the police department. And that just isn't the case here. And that's why I raised it earlier. You asked me why I raised PAPAS. That's why I raised it, because there was a lot of publicity there, you know, and in Lakota where the speech, again, was pretty horrifying. And so we distinguish those cases not only on the basis of the value to be a court of the speech, which we think in this instance should be much higher, but also on the fact that there were, in fact, a lot of publicity already associated with that speech. What are we to make of that arbitral decision, by the way? Does it have any relevance or effect? Well, the defendants argue that the court below didn't give it sufficient weight. But the reason the court below didn't give it sufficient weight is because they didn't ask him to give it weight. They said it was collateral estoppel. He addressed that argument. He concluded that it didn't have collateral estoppel effect, and they don't raise that here on appeal. And in fact, in addition, Your Honor, they actually objected to the admission of the arbitration decision in the court below. This is on 593 of the record. So the arbitration decision- What's your position on the use of it, rather than- I'm sorry? What is your position on the use of the arbitral decision? Well, if you don't ask, it wasn't admitted. So it can't be a piece of evidence not on this appeal, at least. They didn't ask to have it admitted as a piece of evidence. They didn't put in any evidence about how the arbitration was conducted, whether there was adequate and fair procedures, whether the arbitrator was new to all of that stuff, which if you want to have it give weight, you have to do. None of that was done. So there was no evidentiary basis for its admission. Been up here for a long time, Your Honor. Thank you so much. Well, we've cut you. Thank you very much. We request affirmation of the judgment of the court below. I'm shocked to hear that. Yeah. Okay. Are you still here? I am. Good morning again, Your Honors. Very briefly, I'd like to start with the appearance of impartiality in the agency's reputational interest, because I think as the panel has identified, that's really the heart of this case. And when it comes to an agency's assessment of its own reputational harm, this Court in Piscitano held that the agency's assessment should be accorded to deference and actually relied not on proof of actual disruption or empirical evidence, but instead on the agency's top official's assessment of reputational harm. In Piscitano, that case involved prison guards who were affiliated with a motorcycle club, and the agency's top officials assessed that their affiliation could jeopardize the agency's reputation for professionalism, their judgment, and could lead prisoners from rival clubs to claim that they were being treated unfairly. Again, there was no actual concrete disruption proffered in that case.  And here we have the testimony of the agency officials that similar types of reputational harm are likely to occur. Unrebutted testimony. That's correct, Your Honor. And we also have the findings of an arbitrator, which I'd like to get to later. But I think the key here is that while the district court does not need to rubber stamp the agency's conclusions, it certainly needs to afford, as the Supreme Court noted in Connick, a wide degree of deference when an agency's assessments are about close working relationships and their operations. And that's precisely what we have here. There are constraints, of course, to the agency's decision making, but this court has looked to, for example, the role of the public employee, the nexus between the speech and the employee's duties to assess whether or not the agency's conclusions were reasonable. And here we have the most public-facing employee of the agency, a hearing officer, who represents the agency to its client population. And we have speech that directly touches on a benefit that that hearing officer administers. And importantly, an important aspect of his job is to make credibility findings, and that's prescribed by regulation. So when we take all of these factors together into consideration, the agency's assessment was certainly reasonable. If I may, I'd like to briefly touch on the absence of objections. And here we think that there's simply a number of reasons why legal aid may not have spoken up, especially given the fact that he was immediately taken off the bench. Legal aid is an institutional actor, so it may have decided that its action was not warranted,  But nobody asked that. Here, they're in the middle of this case, and nobody, I gather there was a little side discussion between the members of the government, but there were no witnesses from legal aid saying, yeah, we would have done it, or no, we wouldn't. That's correct, Your Honor, and that's a determination by the agency that they didn't want to risk further publicization. But I don't think that undercuts the agency's reasonable assessment that if the plaintiff were restored to the bench, that legal aid could take further action and lose public faith in the agency. And if I just may very briefly touch on the arbitration, we cited the Collins case, which we rely on here below in the district court, and I think even if this court doesn't think that the decision should have been given probative weight, at the very least, there was a freestanding, independent decision out there that concluded plaintiff's continued employment as a hearing officer was untenable. And in light of this finding, the agency, if they had kept him in place, could have been viewed as condoning disrespect towards its client population. And I think that makes the agency's conclusions here all the more reasonable. And you would ask for a lease for us to do something with respect to the reinstatement? Yes, Your Honor. Can you just repeat that again? Sure, Your Honor. We would ask for reversal of partial summary judgment in plaintiff's favor, which would vacate the reinstatement order, the injunction in this case. And we think the court also has- Because there are disputed facts. And so let that go to do what? So in this case, Your Honor, we think that pickering balancing favors the agency as a matter of law, and that would require a vacater of the reinstatement. But even if this court finds that there's even one material disputed fact here, it still must vacate the reinstatement order, because summary judgment in plaintiff's favor in that case would have been improper. Thank you very much. Thank you, Your Honor. That concludes today's argument calendar. And I'll ask the Court of the Deputy to adjourn the court. Please. Court is adjourned.